UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
PAN AMERICAN WORLD AIRWAYS, INC.,  :
                                      :          06 Civ. 14442 (CSH)
                Plaintiff,  :
                                      :
     -against-          :      MEMORANDUM OPINION
                                    :        AND ORDER
FLIGHT 001, INC., and FLIGHT 001  :
HOLDINGS, INC.,  :
                Defendants.  :
--------------------------------------------------------------- x
HAIGHT, Senior District Judge:

        In this action, plaintiff Pan American World Airways, Inc. ("Pan Am") alleges trademark infringement and unfair competition by defendants Flight 001, Inc. and Flight 001 Holdings, Inc. (collectively, "Flight 001").  Plaintiff contends that Flight 001 intentionally appropriated the goodwill and mystique associated with Pan Am's famous brand by using the Pan Am Globe logo, PAN AM word mark, PAN AM trade name, the Pan Am light blue and white color combination, and the FLIGHT 001 mark in defendants' stores and on their website.  Plaintiff seeks a preliminary injunction preventing further infringement.

## I. BACKGROUND

### A.    The Original Pan Am

        The original Pan American World Airways, Inc. ("original Pan Am"), a New York corporation, was an air travel pioneer and trend-setter that "introduced the United States and the world to the golden age of air transportation through [its] innovations in domestic, international, transoceanic and intercontinental flight."  Pl.'s Mem. at 3.[1]  For example, the original Pan Am was

---

[1] Plaintiff Pan Am is a separate corporate entity from the original Pan Am.  Although both bear the corporate name Pan American World Airways, Inc., the former is a Delaware corporation while the latter was a New York corporation.  The relationship between the original Pan Am and plaintiff Pan Am is explained more fully in Section I.B., *infra*.

the first American airline to operate jets within the continental United States, operate an ongoing international service, employ cabin attendants and serve meals aloft, and complete an around-the-world flight.

In 1931, the original Pan Am began using the PAN AM word mark to identify its air transportation services.  By 1956, it was using the Pan Am Globe logo on aircraft, and in the marketing and sale of its air travel-related products and services.  Around the late 1950s, the original Pan Am began depicting the PAN AM word mark and Pan Am Globe logo in a light blue and white color combination, which was also used for aircraft, products, advertising, and marketing.  The original Pan Am used the Pan Am Globe logo and PAN AM word mark on merchandising products as early as 1963.  Between 1963 and 1991, a commercial office building in New York City prominently displayed the PAN AM word mark.  The PAM AM trade name, PAN AM word mark, and Pan Am Globe logo have also appeared in well-known films, including Stanley Kubrick's *2001: A Space Odyssey*, numerous James Bond movies, and *Catch Me If You Can*, the 2002 feature film starring Tom Hanks and Leonardo DiCaprio.

From 1942 to 1981, the original Pan Am offered a globe-hopping flight—Pan Am Flight 1—that originated in San Francisco, stopped in Honolulu, Tokyo, Hong Kong, Bangkok, Delhi, Beirut, Istanbul, Frankfurt, London, and finally landed in New York, 48 hours after its initial take-off.

Plaintiff asserts that the Pam Am marks are "powerful symbols of the height of sophistication, the suave and the cosmopolitan" and that:

> As a result of the widespread and longstanding use by the Pan Am Companies of the Pan Am Marks, the Pan Am Companies' reputation as a leader and trend-setter in the world of commercial aviation, their history of

providing superlative service, style and comfort, and their vast expenditures in promoting the brands, the PAN AM word mark and Pam Globe logo became and continue to be among the most famous and recognizable in the world.

Pl.'s Mem. at 9.

However, the original Pan Am suffered significant setbacks—involving events such as the 1973 energy crisis, the 1988 destruction of Pan Am Flight 103 over Lockerbie, Scotland, and deregulation of the airline industry—and filed for bankruptcy in 1991. The assets of the original Pan Am were liquidated during the bankruptcy proceeding.

Defendants contend that "[t]he popular conception is that the airline [the original Pan Am] is extinct." Defs.' Suppl. Mem. at 2 (citing the Pan American World Airways Historical Foundation newsletter, which reprinted a September 2, 2006 newspaper article referring to the original Pan Am as "an extinct business").

**B.    Plaintiff Pan Am**

Plaintiff Pan Am is a Delaware corporation with its principal place of business in New Hampshire. Plaintiff acquired the original Pan Am's trademarks in the original Pan Am's bankruptcy proceeding.

During the original Pan Am's bankruptcy proceedings, the trademarks owned by the original Pan Am were transferred to Eclipse Holdings, Inc. ("Eclipse") in a December 20, 1993 purchase agreement, for a purchase price of $1,325,000. The trademarks were then transferred from Eclipse to Cobb Partners, Inc. ("Cobb") in another December 20, 1993 purchase agreement. On December 29, 1993, Cobb and Eclipse then entered a letter agreement in which they agreed that plaintiff Pan Am would step in as the purchaser under the December 20, 1993 purchase agreement between

3

Eclipse and the original Pan Am.  In another December 29, 1993 document, Eclipse assigned the trademarks it had acquired from the original Pan Am to plaintiff Pan Am.

After acquiring the trademarks used by original Pan Am, plaintiff undertook preparations to offer flight services.  For example, plaintiff raised capital, recruited operating personnel, obtained and implemented computer passenger reservation and management information systems, negotiated airport gate and terminal facilities and aircraft leases, contracted for ground handling and aircraft maintenance services, conducted pilot and flight attendant training, and obtained certification from the Department of Transportation and the Federal Aviation Administration.  Plaintiff Pan Am also hired Martin R. Shugrue, Jr. as its President and Chief Executive Officer.  Shugrue had been Vice Chairman of the Board of the original Pan Am (or its parent company).

In September of 1996, plaintiff Pan Am commenced flight operations between New York's Kennedy International Airport and Miami and Los Angeles.  In the following months, the service was expanded to include flights between San Juan, Puerto Rico and Miami, New York and San Juan, and Chicago and Miami.

However, plaintiff Pan Am filed for bankruptcy in February of 1998.  As a result of those proceedings, plaintiff became a wholly owned subsidiary of Pan Am Systems, Inc. ("Pan Am Systems"), which was formerly known as Guilford Transportation Industries, Inc.  Plaintiff now provides airline services between several cities in the Northeast, including Portsmouth, NH, Bedford, MA, Trenton, NJ, New Haven, CT, Washington, DC (BWI), and Elmira, NY, as well as Orlando/Sanford, FL, using a fleet of 19-passenger turboprop planes.  Plaintiff uses the PAN AM word mark, Pan Am Globe logo, and light blue and white color combination in connection with its present airline services.

In March of 2005, Pan Am Systems began using the PAN AM trade name, PAN AM word mark, Pan Am Globe logo, and light blue and white color combination in connection with its rail freight services.

Plaintiff licenses others to use the PAN AM word mark and Pan Am Globe logo on merchandise, including model airplanes and trains and travel-related products such as flight bags. Pan Am has a licensee that uses the PAN AM word mark and Pan Am Globe logo in connection with a retail store that sells travel-related products. In addition, plaintiff states that it "plan[s] to expand [its] existing operations in the retail services arena, including the operation of Pan Am-branded stores that would sell Pan Am-branded merchandise and other items that relate to travel or otherwise to the legacy of the Pan Am Companies." Culliford Decl. ¶ 36.

## C.    Flight 001

The collective defendant Flight 001 operates a chain of retail stores and a website that feature travel-related products.[2] Flight 001 was co-founded by John Sencion and Brad John, who came up with the idea of creating a travel-related store associated with a stylish design and lifestyle in May of 1998 while flying between New York and Paris. In interviews and promotional materials, Sencion has explained that Flight 001 was inspired by Pan Am's Flight 1 and the original Pan Am's image and style. For example, the Flight 001 website at one point stated: "The duo [Sencion and John] commemoratively named their venture after Pan Am's Flight 001, the world's first and only seamless transcontinental commercial carrier. Taking cues from its namesake, Flight 001 caters to international trend setters who both require and aspire to travel the world and look great while doing

---

[2] Defendants are New York corporations, with their principal places of business in New York City.

5

it."  Nishi Decl. ¶ 9.  Sencion has also stated: "Our inspiration is Pan Am, and essentially, we want to pick up where they left off."  Nishi Decl. ¶ 8.

Flight 001 began with a small shop in Greenwich Village in New York City, and has successfully expanded over the past nine years.  Defendant currently operates retail stores in Manhattan, Brooklyn, San Francisco, Los Angeles, Berkeley, and Chicago; and may soon be operating stores in Miami, San Diego, and Las Vegas.  Flight 001 also operates a website, which promotes defendants' retail stores and sells merchandise.

Defendants use the FLIGHT 001 trade name, and a design mark that consists of the term FLIGHT 001 together with the design of a plane, a suitcase, and a globe.  Defendants hold United States trademark registrations for the use of this mark in connection with retail store services for travel-related products, and in connection with a wide variety of items including bags and cosmetics. The former registration was obtained in 1999, and the latter in 2003.  The mark is featured prominently within defendants' stores, and on items such as luggage, travel accessories, bags, cosmetics, and gift cards.  Defendants' retail stores also use a meridian globe logo (the "Flight 001 Globe logo"), which plaintiff contends is highly similar to the Pan Am Globe logo.  Defendants' FLIGHT 001 design mark and Flight 001 Globe logo use a light blue and white color combination.

In the past, the Flight 001 website featured the Pan Am Globe logo, PAN AM trade name, photographs of Pan Am airplanes and flight attendants, and historical advertisements that had been used by the original Pan Am.  The website included pull-down menus describing the history of the original Pan Am and the history of Pan Am's Flight 1.  The website also marketed and sold Pan Am merchandise, including flight bags and alarm clocks.  Defendants' retail stores featured Pan Am merchandise and memorabilia, such as vintage flight bags and model airplanes, and a map of the

6

route of Pan Am Flight 001 behind the cashier's desk.[3]

However, defendants state that, "as a show of good faith," they have voluntarily stopped selling Pan Am merchandise or using the Pan Am name or globe.  Sencion Suppl. Decl. at ¶¶ 4-5. Defendants continue to use the FLIGHT 001 trade name, FLIGHT 001 design mark, and the Flight 001 Globe logo.

**D.      Interactions Between the Parties and Procedural History**

In October 2005, Sencion sent an e-mail to Bob Culliford, Pan Am's General Counsel and Secretary to indicate that he was interested in Pan Am licensing generally.  Sencion followed up with several voice mail messages, but Mr. Culliford never responded.

Around June 2006, defendants were contacted by Anthony Lucas, an employee of Live Advertising, Inc., which is a company licensed by Pan Am to authorize others to manufacture and distribute certain Pan Am-branded merchandise.  Defendants met with him about the possibility of obtaining officially licensed Pan Am merchandise.  Sencion contacted plaintiff Pan Am about this matter around June or July 2006.  But plaintiff states that it did not discover defendants' extensive use of Pan Am marks until August 16, 2006.  On or about August 23, 2006, plaintiff sent a letter to Flight 001 demanding that defendants cease and desist from their use of Pan Am marks.

The parties then explored the possibility of a settlement, but no agreement was reached.  Pan Am filed a complaint in the United States District Court for the Eastern District of Virginia on September 18, 2006 and served the complaint on defendants on October 19, 2006, after Pan Am

---

[3] Plaintiff claims that Flight 001 used the Pan Am name, marks, and merchandise on its website and in its stores in an effort to misappropriate the Pan Am's brand identity, while defendants contend that they used the Pan Am name and globe to promote their sale of Pan Am merchandise and to pay tribute to Pan Am.

concluded that a settlement could not be reached.  Plaintiff moved for a preliminary injunction on November 16, 2006.  On December 1, 2006, with the motion for preliminary injunction pending, the case was transferred to this Court.

In May 2007, this Court heard oral arguments on the motion for preliminary injunction, and the parties submitted additional briefs and materials.

**E.      Plaintiff's Claims and Requests for Relief**

**1.      Plaintiff's Complaint**

Plaintiff's complaint asserts six claims: (1) trademark infringement of the federally registered Pan Am Globe logo in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; (2) unfair competition and false designation of origin related to unregistered Pan Am marks and the FLIGHT 001 mark in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (3) dilution of the PAN AM word mark, Pan Am Globe logo, and Pan Am color combination in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c); (4) cyberpiracy through use of the www.flight001.com Internet domain name in violation of Section 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); (5) misrepresentation of goods and services in violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-200; and (6) common law trademark infringement.

The complaint seeks to enjoin defendants from using Pan Am marks or the FLIGHT 001 mark in connection with its business and promotion of goods; making representations regarding sponsorship or association between defendants and Pan Am; or further acts of infringement, dilution, and unfair competition against Pan Am.  Plaintiff asks the Court to order defendants to destroy all products, labels, signs, prints, packages, wrappers, receptacles, and advertisements that bear Pan Am marks or the FLIGHT 001 mark.  Plaintiff seeks treble damages for all profits derived by defendant

and all damages incurred by Pan Am by reason of defendant's infringement of Pan Am marks. Plaintiff seeks to transfer the registration for the www.flight001.com domain name to Pan Am. Lastly, plaintiff seeks attorneys' fees.

###### 2.     Plaintiff's Motion for Preliminary Injunction

Plaintiff has moved for a preliminary injunction based on: (1) trademark infringement of the PAN AM trade name, PAN AM word mark, Pan Am Globe logo, Pan Am blue and white color combination, and FLIGHT 001 mark under Section 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a); (2) unfair competition (or false designation of origin) related to those marks under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a); and (3) trademark dilution of the PAN AM trade name, PAN AM word mark, and Pan Am Globe logo in violation of Section 43(c) of the Lanham Act, 15 U.S.C. 1125(c).

Plaintiff's motion for preliminary injunction seeks an order preventing defendants from: using FLIGHT 001 in connection with their stores, products, and website; using or selling products with the PAN AM trade name or word mark; using or selling products with the Pan Am Globe logo or any colorable imitation; making any references to Pan Am; or using blue and white coloring in combination with any airline or travel imagery.  Plaintiff further seeks to order defendants to deliver up for destruction all labels, signs, prints, packages, wrappers, receptacles, and advertisements bearing the Pan Am marks (or any colorable imitation of them) or the FLIGHT 001 mark.  Finally, plaintiff seeks an order directing defendants to cease communications under the name FLIGHT 001 and to request that print and electronic publishers, portals, and Internet search engines delete all references to Flight 001 from their databases and directories.

## II.  DISCUSSION

**A.      Standard of Review for Preliminary Injunction**

"[I]n order to obtain a preliminary injunction, a party must demonstrate probability of irreparable harm in the absence of injunctive relief, and either a likelihood that it will succeed on the merits of its claim, or a serious question going to the merits and a balance of hardships tipping decidedly in its favor."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 145 (2d Cir. 2003).  In a trademark infringement action, where plaintiff's mark merits protection, "proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm."  *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004).

**B.      The Issues Raised by Plaintiff's Motion**

Plaintiff seeks a preliminary injunction based on claims of trademark infringement, unfair competition, and dilution related to the PAN AM trade name, PAN AM word mark, Pan Am Globe logo, Pan Am blue and white color combination, FLIGHT 001 mark, and Flight 001 Globe logo. Plaintiff presents evidence that, in the past, defendants' stores and website featured the Pan Am Globe logo, the PAN AM trade name, the PAN AM word mark, and Pan Am merchandise. However, defendants contend that plaintiff's motion is largely moot because Flight 001 has voluntarily stopped selling Pan Am merchandise or using the Pan Am marks.  Sencion Suppl. Decl. ¶¶ 4-5.

As an initial matter, the Court must determine which marks are actually at issue on this motion—and, specifically, whether Flight 001 should be subject to a preliminary injunction for marks that it has voluntarily stopped using.  Some district courts in the Second Circuit have held that defendant's voluntary cessation of activity "affords no reason for denying a preliminary injunction."

*Mercury Record Corp. v. Buckingham Record Co.*, 226 F. Supp. 427, 429 (S.D.N.Y. 1963); *see also Consumers Union of United States, Inc. v. Theodore Hamm Brewing Co.*, 314 F. Supp. 697, 701 (D. Conn. 1970); *Consumers Union of United States, Inc. v. Admiral Corp.*, 186 F. Supp. 800, 801 (S.D.N.Y. 1960) (noting that "if defendant has no intention of using the offending advertisement, then no injury ensues to it from the granting of the [preliminary] injunction"). But I conclude that such a rule is at odds with the nature of a preliminary injunction, which is an "extraordinary equitable remedy," *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 277 F.3d 253, 258 (2d Cir. 2002), requiring that the plaintiff "demonstrate probability of irreparable harm in the absence of injunctive relief." *Nawab*, 335 F.3d at 145. Although trademark infringement can cause irreparable harm, plaintiff must still show a sufficient likelihood that the infringing conduct will occur in the near future so as to justify a preliminary injunction. *See Am. Bd. of Psychiatry & Neurology, Inc. v. Johnson-Powell*, 129 F.3d 1, 4 (1st Cir. 1997).[4] Here, plaintiff has not presented any evidence that defendants are currently selling Pan Am merchandise or using Pan Am marks in their stores or on their website—or that defendants intend to do so in the near future. In these circumstances, I conclude that plaintiff is not entitled to a preliminary injunction related to defendants' past use of the PAN AM trade name, PAN AM word mark, or Pan Am Globe logo.

Of course, these issues are not completely removed from the litigation. Plaintiff remains free

---

[4] In *Johnson-Powell*, the First Circuit held: "[W]hile certification mark and trademark infringements may be presumed without more to cause irreparable harm, there is no parallel presumption that because such infringements have occurred in the past, they will inevitably be continued into the future. Rather, plaintiff retained the ordinary burden of showing a sufficient likelihood that the infringing conduct would occur in the future so as to give rise to an enjoinable threat of irreparable harm." *Id.* The court of appeals affirmed the district court's denial of a preliminary injunction—even though the plaintiff was likely to succeed on the merits—where the district court found no risk that the defendant would infringe in the near future.

to seek monetary damages for past infringement related to defendants' prior use of the PAN AM trade name, PAN AM word mark, and Pan Am Globe logo; and the possibility that defendant could resume its prior uses could justify a permanent injunction if past infringement is demonstrated.  But for the present, I hold that defendants' prior uses of the PAN AM trade name, PAN AM word mark, and Pan Am Globe logo are not properly subject to a preliminary injunction at this time because plaintiff has not demonstrated that defendant is likely to resume such uses in the near future.[5]

Defendants continue to use the FLIGHT 001 trade name, FLIGHT 001 design mark, Flight 001 Globe logo, and a light blue and white color combination.  If these uses are likely to infringe upon plaintiff's trademark rights, then plaintiff has established a probability of irreparable harm.  Therefore, the proper issues to be addressed on plaintiff's motion for a preliminary injunction are: (1) whether defendants' use of the FLIGHT 001 trade name and design mark infringes plaintiff's unregistered mark in violation of Section 43(a) of the Lanham Act; (2) whether defendants' use of the Flight 001 Globe logo infringes plaintiff's registered Pan Am Globe logo in violation of Section 32 of the Lanham Act; (3) whether defendants' use of a light blue and white color combination constitutes trade dress infringement in violation of Section 32 of the Lanham Act; (4) whether defendants' use of the FLIGHT 001 trade name, FLIGHT 001 design mark, Flight 001 Globe logo, and blue and white color combination are unfair competition under Section 43(a) of the Lanham Act;

---

[5] Note that I do not conclude that a preliminary injunction is *never* appropriate where the defendant has voluntarily ceased the allegedly infringing conduct.  Even if a defendant has stopped the allegedly infringing conduct and represents that he will not resume, a plaintiff may be able to show that the defendant's representation is unreliable or untrustworthy and that future infringement is in fact probable.  A preliminary injunction could be appropriate in those circumstances suggestive of a likelihood of future infringement, notwithstanding the defendant's voluntary cessation.  Plaintiff at bar may reapply for a preliminary injunction if it can show that defendants have resumed, or are likely to resume, using the PAN AM trade name, PAN AM word mark, or Pan Am Globe logo in connection with their business.

and (5) whether defendants' use of the Flight 001 Globe logo is trademark dilution of plaintiff's Pan Am Globe logo in violation of Section 43(c) of the Lanham Act.

The first three issues require applications of trademark infringement law.  I analyze these claims together before turning to the claims for unfair competition and dilution.

## C.   Trademark Infringement

The Lanham Act addresses trademark infringement of both registered and unregistered marks.  Section 32 of the Lanham Act prohibits the use of a "registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services" when "such use is likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114.  Section 43(a) of the Lanham Act prohibits "any false designation of origin," including use of an unregistered mark, "which is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of [the defendant] with another person, or as to origin, sponsorship, or approval of [the defendant's] goods, services, or commercial activities by another person."  15 U.S.C. § 1125(a)(1).

To prevail on a claim of trademark infringement under the Lanham Act, "the plaintiff must show, first, that its mark merits protection, and second, that the defendant's use of a similar mark is likely to cause consumer confusion" as to the origin, sponsorship, or affiliation of the defendant's goods.  *Brennan's*, 360 F.3d at 129-30 (quoting *Gruner + Jahr USA Publ'g v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir. 1993)).  And, as a threshold matter, plaintiff must also establish its ownership of—or superior right to use—the mark in question.  *See P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972) ("To be entitled to relief, however, [plaintiff] must show not only confusing similarity, but priority of right over [defendant] to the use of the [plaintiff's] mark.").  This framework of analysis for trademark infringement applies whether the

13

claim involves a registered mark (under 15 U.S.C. § 1114) or an unregistered mark acquired by use (under 15 U.S.C. § 1125(a)).  *See, e.g., Nawab*, 335 F.3d at 146.

The analysis for trade dress infringement is essentially the same as that for trademarks.  *See, e.g., Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 773 (1992) (stating that "the protection of trademarks and trade dress under § 43(a) serves the same statutory purpose of preventing deception and unfair competition" and "[t]here is no persuasive reason to apply different analysis to the two").

## 1.    Plaintiff's Ownership of the Marks at Issue

Defendants contend that plaintiff has not demonstrated valid ownership of the marks at issue for several reasons.  First, defendants argue that the chain of title does not clearly establish which of the original Pan Am's marks were transferred to plaintiff in the 1993 bankruptcy proceeding.  Second, defendants argue that any such transfer was invalid because the original Pan Am's goodwill did not actually pass to the plaintiff.  Third, defendants argue that plaintiff has no ownership rights in the FLIGHT 001 mark because neither plaintiff nor the original Pan Am ever used that mark (and, in any event, the original Pan Am stopped operating its Flight 1 in 1981).

### (a)    Which of the original Pan Am's marks were transferred to plaintiff?

The record submitted by plaintiff sufficiently establishes the following transactions in connection with the original Pan Am's bankruptcy proceeding.  The trademarks owned by the original Pan Am were transferred to Eclipse in a December 20, 1993 purchase agreement.  Another December 20, 1993 purchase agreement transferred the trademarks from Eclipse to Cobb.  In a December 29, 1993 letter agreement, Cobb and Eclipse agreed that plaintiff Pan Am would step in as the purchaser under the December 20, 1993 purchase agreement between Eclipse and the original

14

Pan Am.  In another December 29, 1993 document, Eclipse assigned the trademarks it had acquired from the original Pan Am to plaintiff Pan Am.

The December 20, 1993 purchase agreement between the original Pan Am and Eclipse, to which plaintiff stepped in as purchaser, defined the marks to be transferred in the following way: "[D]uring the course of their [the original Pan Am's] business operations (including their business operations as debtors in possession), Sellers adopted and used certain trademarks, trade names, service marks, and worldwide registrations therefor (collectively, 'The Marks'), certain of which are identified in Schedule 1 to the Trademark Assignment attached hereto as Exhibit A."  Culliford Decl., Ex. 1.  Defendants argue that is unclear which "certain" marks were transferred, and note that the attached schedule is incomplete and illegible.  But when read in context, it appears clear that the agreement intended to transfer *all* trademarks adopted and used by the original Pan Am, including (but not limited to) those marks identified in the schedule.  Therefore, the use of the word "certain" and the absence of the referenced schedule are not fatal to plaintiff's claims.

I find that plaintiff has presented adequate evidence that the 1993 purchase agreement intended to transfer all of the original Pan Am's trademarks to plaintiff.  However, plaintiff must further establish that the transfer was accompanied by goodwill, and that the original Pan Am owned trademark rights in the marks at issue.  I next address those two issues.

### (b)      Were the original Pan Am's marks separated from their goodwill?

Defendants argue that the original Pan Am's trademarks were not validly transferred to the plaintiff because the marks, as used by plaintiff, were separated from the goodwill associated with the original Pan Am.

The Second Circuit has held that "a trademark cannot be sold or assigned apart from the

15

goodwill it symbolizes." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984). "Use of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing, whether used by one person or another." *Id.* Therefore, the sale of a trademark divorced from its goodwill is an invalid "assignment in gross." *Id.* The test for whether good will has passed as part of a trademark assignment looks to whether "the purchaser was able to go on in real continuity with the past," *Defiance Button Mach. Co. v. C & C Metal Prods. Corp.*, 759 F.2d 1053, 1060 (2d Cir. 1985), or whether "the assignee is producing a product or performing a service substantially similar to that of the assignor and that the consumers would not be deceived or harmed," *Marshak*, 746 F.2d at 930.[6]

In this case, plaintiff has sufficiently demonstrated that it performed services substantially similar to those of the original Pan Am. After acquiring the trademarks in 1993, plaintiff undertook extensive preparations to offer flight services, and eventually operated flights in and out of New York, Miami, Los Angeles, Chicago, Miami, and San Juan, Puerto Rico. In addition, plaintiff hired Martin Shugrue, a former Vice Chairman of the Board of the original Pan Am, as plaintiff's President and Chief Executive Officer. This provides evidence of "real continuity" between the original Pan Am and plaintiff. *See Marshak*, 746 F.2d at 930 ("Courts have also upheld such assignments [of trademarks apart from the business] if there is a continuity of management."). Therefore, plaintiff has sufficiently demonstrated that the 1993 transfer of the original Pan Am's

---

[6] That the 1993 purchase agreement purported to assign the original Pan Am's marks "together with any and all of the goodwill of the business," Culliford Decl. Ex. 1., does not control the analysis. Rather, "courts will look to the reality of the transaction to see if 'good will' passed." J. T. McCarthy, 3 *McCarthy on Trademarks and Unfair Competition* § 18:24 (4th ed. 2007) ("*McCarthy*").

16

trademarks involved a transfer of goodwill.

However, plaintiff filed for bankruptcy in 1998.  As a result of those proceedings, plaintiff was acquired by Pan Am Systems (formerly known as Guilford Transportation Industries, Inc.), and plaintiff's business operations changed to some degree.  Although plaintiff states that there was no assignment of the trademarks in the 1998 bankruptcy proceeding, it is still necessary to consider whether the goodwill associated with the Pan Am marks was lost due to a substantial change in the nature or quality of the goods sold under the mark.  *See Bambu Sales, Inc. v. Sultana Crackers, Inc.*, 683 F. Supp. 899, 906 (E.D.N.Y. 1988) ("It is true that a substantial change in the goods sold under a mark may so alter the nature of the good will symbolized that use of the mark is tantamount to a fraud on consumers and the original right to the mark is abandoned or lost. . . .  In fact, this principle obtains whenever there is a drastic alteration in the goods sold under a mark, whether or not that change occurred in conjunction with an assignment.").

Plaintiff now provides airline services in and out of several cities, including Portsmouth, NH, Bedford, MA, Trenton, NJ, New Haven, CT, Washington, DC (BWI), Elmira, NY, and Orlando/Sanford, FL.  In addition, Pan Am Systems now uses Pan Am trademarks in connection with its rail freight services.  Although plaintiff's business model and business operations have changed somewhat, these changes do not rise to the level of a "drastic alteration" that would forfeit plaintiff's right in the marks because plaintiff continues to provide airline services to passengers.  Moreover, although plaintiff's flight operations are much more modest in scope than those of the original Pan Am, they are not the type of "token use"—intended merely to reserve a right in a mark —that courts have found insufficient to support trademark rights.  *Cf. Jaffe v. Simon & Schuster*, 1987 WL 124312 (S.D.N.Y. Jan. 16, 1987) (nominal or token sales to personal friends and relatives

not sufficient to establish trademark rights).

        **(c)**      **Does Pan Am have trademark rights in the Flight 001 mark?**

Plaintiff has adequately demonstrated that the 1993 purchase agreement intended to transfer all of the original Pan Am's trademarks to plaintiff, and that the marks were not separated from their goodwill. However, plaintiff must further establish that the original Pan Am owned trademark rights in the marks at issue. While it is not disputed that the original Pan Am owned rights in the Pan Am marks, defendants contend that the original Pan Am never made any trademark use of or owned any trademark rights in the FLIGHT 001 mark. I agree.

To establish ownership of a trademark right, one must actually use the symbol "to identify the goods or service of one seller and distinguish them from those offered by others." *Tactica Int'l, Inc. v. Atlantic Horizon Int'l, Inc.*, 154 F. Supp. 2d 586, 599 (S.D.N.Y. 2001); 2 *McCarthy* § 16:1 ("To create trademark or trade dress rights, a designation must be proven to perform the job of identification: to identify one source and distinguish it from other sources. If it does not do this, then it is not protectable as a trademark, service mark, trade dress or any similar exclusive right.").

The original Pan Am operated a Flight 1 from 1942 to 1981. But there is no evidence that it ever used the term "Flight 1" to distinguish its services from those offered by other airlines or companies, rather than simply to distinguish one Pan Am flight from other Pan Am flights (such as Flight 2). Therefore, the original Pan Am never made any trademark use—or obtained any trademark rights—in the FLIGHT 001 mark.

In addition, the original Pan Am discontinued the flight in 1981 and apparently sold the line—along with its entire Pacific Ocean network—to United Airlines in 1985. *See* Sencion Decl., Ex. 2. "If . . .an owner ceases to use a mark without an intent to resume use in the reasonably

18

foreseeable future, the mark is said to have been 'abandoned.'" *ITC Ltd. v. Punchgini, Inc.,* 482 F.3d 135, 147 (2d Cir. 2007). "The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark." *Id.* at 146. In this case, because the original Pan Am stopped operating its Flight 1 in 1981 and then sold the line to United Airlines, it is apparent that the original Pan Am had no intention of resuming use in the reasonably foreseeable future. Thus, even if the original Pan Am had used "Flight 1" as a trademark at some point, any trademark right in the mark would have been abandoned by 1993.

For these reasons, I find that the original Pan Am held no trademark rights in the FLIGHT 001 mark in 1993; and consequently that mark could not have been transferred to plaintiff during the bankruptcy proceeding. Plaintiff has not attempted to established any trademark rights in the FLIGHT 001 mark based on its own use of the mark (as opposed to use by the original Pan Am). Therefore, plaintiff's claims for trademark infringement by the FLIGHT 001 mark are without merit.

I turn now to plaintiff's claims that defendants engaged in trademark infringement with respect to the Pan Am Globe logo and the Pan Am blue and white color combination.

## 2.    **Whether These Marks Merit Protection**

A mark is presumed to merit protection when the plaintiff has a valid, registered trademark. An unregistered mark is entitled to protection under the Lanham Act if it is "sufficiently 'distinctive' to distinguish the [user's] goods from those of others." *Star Indus. Inc. v. Bacardi & Co.*, 412 F.3d 373, 381 (2d Cir. 2005). "The mark may be 'inherently distinctive' if its intrinsic nature serves to identify its particular source. Alternatively, even if not inherently distinctive, the mark may be distinctive by virtue of having acquired a 'secondary meaning' in the minds of consumers." *Id.* (citations omitted).

The Pan Am Globe logo, a federally registered mark, clearly merits protection.  It is a famous logo that distinguishes Pan Am's goods and services from those of others.[7]  Furthermore, plaintiff's use of a light blue and white color scheme in combination with the PAN AM name, PAN AM mark and Pan Am Globe logo is likely to merit trade dress protection.  Plaintiff has sufficiently established that, due to extensive usage and marketing, consumers associate this color and design scheme with Pan Am.[8]

To the extent that plaintiff seeks to bring a trade dress infringement claim based on a broader "Pan Am Brand Identity," the elements of that trade dress have not been sufficiently specified.  The Second Circuit has explained: "[F]ocus on the overall look of a product [in trade dress analysis] does not permit a plaintiff to dispense with an articulation of the specific elements which comprise its distinct dress. Without such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market." *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 381 (2d Cir. 1997). Here, plaintiff states: "For many decades, the Pan Am Companies have used unique and distinctive visual elements that, when used in combination with some or all of the Pan Am Marks, create a distinctive, consistent, proprietary brand identity (the 'Pan Am Brand

---

[7] Although the federal registration is still in the name of the original Pan Am, plaintiff has sufficiently demonstrated that this ownership was transferred to plaintiff Pan Am as a result of transactions in connection with the 1993 bankruptcy proceedings.

[8] Plaintiff has not established that the blue and white color combination, by itself and without more, constitutes a protectable trade dress.  Inherent distinctiveness is unlikely because numerous other airlines use blue and white color combinations.  Furthermore, plaintiff has not demonstrated a secondary meaning associated with the color combination alone; virtually every example provided by plaintiffs features the blue and white color scheme in combination with the PAN AM mark and Pan Am Globe logo.

Identity').”  Pl.'s Proposed Findings of Fact and Conclusions of Law, ¶ 5.  It is not clear what "unique and distinctive visual elements” are being referred to.  Thus, plaintiff's invocation of a general Pan Am brand identity—beyond specifically enumerated elements such as the PAN AM mark, Pan Am Globe logo, and blue and white color scheme—is not sufficiently specific.[9]

### 3.      Likelihood of Confusion

If a mark merits protection, the plaintiff must then show a likelihood of consumer confusion. *See Brennan's*, 360 F.3d at 128 (“The key for a plaintiff in proving infringement of its trademark is to show the likelihood of consumer confusion.”).  The plaintiff must show “a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers.”  *Star Industries*, 412 F.3d at 383.  The confusion may relate to “source, sponsorship, affiliation, connection, or identification.”  *Id.*[10]

To evaluate the likelihood of consumer confusion, courts in the Second Circuit are guided by the eight-factor test set forth by Judge Friendly in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  These non-exclusive factors are: “(1) the strength of the mark, (2) the degree of similarity between the two marks, (3) the competitive proximity of the products, (4) actual confusion, (5) the likelihood the plaintiff will bridge the gap, (6) the defendant's good faith in adopting its mark, (7) the quality of the defendant's products, and (8) the sophistication of the

---

[9] Furthermore, the specific elements of the trade dress should be specified so that defendants have a fair opportunity to determine whether the original Pan Am still owned trade dress rights in those elements in 1993 or whether plaintiff Pan Am subsequently abandoned any elements of the purported trade dress.

[10] “In order to be confused, a consumer need not believe that the owner of the mark actually produced the item and placed it on the market.  The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement.” *Id.* (quotation and citation omitted).

purchasers." *Brennan's*, 360 F.3d at 130 (citing *Polaroid*).  "No single factor is dispositive, nor is a court limited to consideration of only these factors."  *Id.*  Furthermore, the analysis is not mechanical; rather, "each factor must be evaluated in the context of how it bears on the ultimate question of likelihood of confusion."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 872 (2d Cir. 1986).

Given the analysis *supra*, what the Court must now analyze is the  likelihood of confusion between: (1) the Pan Am Globe logo and the Flight 001 Globe logo, and (2) Pan Am's trade dress, featuring a blue and white color combination used with the PAN AM mark and Pan Am Globe logo, and Flight 001's trade dress.

### a.      The *Polaroid* Factors

### (1)      Strength of the marks

"[T]he distinctiveness or 'strength' of a mark measures its capacity to indicate the source of the goods or services with which it is used."  *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir.1997) (citation omitted).   The concept of strength involves both inherent distinctiveness, or the degree to which a marks is arbitrary or fanciful in relation to the products, and acquired distinctiveness, when "prominent use of the mark in commerce has resulted in a high degree of consumer recognition."  *Nawab*, 335 F.3d at 146.

In this case, the meridian globe used in the Pan Am Globe logo does not possess great inherent distinctiveness.[11]  The image of a meridian globe is naturally related to travel, and numerous travel-related companies use logos that feature meridian globes.  *See* Pearson Decl., Ex. 3.  Similarly,

---

[11] I use the term "meridian globe" to refer to a globe symbol featuring longitudinal and/or latitudinal lines.  The parties' submissions do not suggest a different meaning.

the blue and white color element of plaintiff's trade dress does not appear to be inherently distinctive because numerous airlines use blue and white colors. However, the Pan Am Globe logo is very famous, having acquired worldwide recognition due to prominent use and marketing by the original Pan Am. The trade dress consisting of the Pan Am Globe logo, with the PAN AM word mark and blue and white color combination, has similarly acquired distinctiveness. Overall, this factor favors plaintiff.

### (2) Degree of Similarity

"In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Star Industries*, 412 F.3d at 386 (quoting *Meredith*, 991 F.2d at 1078).

The Pan Am Globe logo and the Flight 001 Globe logo both use meridian globes. However, the specific designs are significantly different. The Pan Am Globe logo features eight stylized latitudinal lines, and a single longitudinal line running down the middle of the logo. The Flight 001 Globe logo features five latitudinal lines, and six longitudinal lines. The effect of the Flight 001 logo is to place a grid pattern over the globe, whereas the Pan Am Globe logo tends to create longer strips of land or sea (between latitudinal lines) that run across the globe. In addition, the PAN AM word mark runs prominently across the middle of the Pan Am Globe logo, while no words or letters are featured in the Flight 001 Globe logo.[12] It is also important to consider the context in which the

---

[12] The Pam Am Globe logo and Flight 001 Globe logo both use a similar blue and white color combination. However, from the materials submitted by plaintiff it appears that the Pan Am Globe is typically (but not always) portrayed with the body of the globe in blue, and the lines and the PAN AM word mark in white. *See, e.g.*, Compl. ¶¶16, 22, 25-27, 38, 41, 46, 47, 49, 50. In contrast, the body of the Flight 001 Globe logo is in white and the lines are in blue, which tends to create a somewhat different visual effect than the usual Pan Am Globe logo. However, I only note this difference in passing because the Pan Am Globe logo has also been used with a

globe logos appear.  The Pam Am Globe logo is typically displayed without any other accompanying logos or symbols (aside from the PAN AM word mark or trade name).  In contrast, the Flight 001 Globe logo in used in conjunction with other symbols.  Defendants' stores feature the logo as part of a wall design of circular tablets, arranged in a pattern that resembles the letter "f" next to the number "1."  One tablet features the Flight 001 Globe logo, while the other tablets feature a symbol of suitcase, a symbol of an airplane, wood paneling, and plain white.  *See* Sencion Suppl. Decl. ¶ 6; Nishi Decl. ¶ 20; Beck Decl. ¶ 14.  Defendants' FLIGHT 001 design mark features the term FLIGHT 001 next to a plane, a suitcase, and a version of the meridian globe (tilted, and cropped).  *See* Sencion Supp. Decl. ¶ 6.  In light of the distinctions between the two globe logos and the different contexts in which they are used, the similarity factor weighs in favor of defendants.

On the issue of trade dress, defendants' FLIGHT 001 design mark use a blue and white color combination that is highly similar to plaintiff's color combination.  However, the color scheme of defendants' stores and website also includes wood paneling, which is not part of the Pan Am trade dress.  Furthermore, as discussed above, the Pan Am Globe logo is different from the Flight 001 Globe logo, and the two globe logos are displayed in different contexts—the Pan Am Globe logo is used as a stand-alone symbol, while the Flight 001 Globe logo appears in conjunction with other symbols.  Finally, plaintiff's trade dress prominently features the PAN AM word mark, while defendants' trade dress instead uses the FLIGHT 001 trade name and design mark.  Under these circumstances, I conclude that the similarity factor also weighs in favor of defendants on the trade dress issue.

---

white body and blue lines.  *See, e.g.*, Compl. ¶ 24; Nishi Decl. ¶ 13.

(3)      **Competitive Proximity**

This factor looks at the extent to which the parties operate in similar or related areas of commerce.  "When the two users of a mark are operating in completely different areas of commerce, consumers are less likely to assume that their similarly branded products come from the same source. In contrast, the closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Nawab*, 335 F.3d at 150.  The Second Circuit looks to "the nature of the products themselves and the structure of the relevant market." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996 (citing and quoting *Vitarroz v. Borden, Inc.*, 644 F.2d 960, 967 (2d Cir. 1981)).  "Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id*.  *See Star Industries*, 412 F.3d at 386-87 (plaintiff's orange-flavored vodka "Georgi O" in "moderate competitive proximity" with defendant's orange-flavored Rum "Bacardi O," because products are marketed to the same consumers in the same bars and stores, though they fall into distinct submarkets of the market for alcoholic beverages); *Nawab*, 335 F.3d at 150 (plaintiff's VIRGIN-branded electronic products in competitive proximity with defendant's VIRGIN-branded consumer electronic audio equipment because plaintiff sold "quite similar items of consumer electronic equipment," and these were "sold in the same channels of commerce"); *Vitarroz*, 644 F.2d at 967 (some proximity but not great proximity where, among other factors, "the crackers are baked, but the chips are fried" and within retail food stores "the products are shelved in different sections whenever space permits, the crackers in the 'cookies and crackers' section, and the chips in the section for 'salty, crunchy snacks,'" and plaintiff targets a particular consumer base

25

who shop in its specialty stores which often do not carry defendant's products).  The Second Circuit has considered both market proximity and geographic proximity to be relevant to the analysis.  *See Brennan's*, 360 F.3d at 134-35 (sizeable geographic separation of plaintiff's restaurant from defendant's restaurant prevented this factor from weighing in plaintiff's favor, even if the restaurants would compete for customers, were they in the same city).

In the case at bar, both plaintiff's and defendants' businesses concern air travel.  Plaintiff's principal use of the Pan Am Globe logo and Pan Am trade dress appears to consist of placing them on the sides of fleets of small passenger aircraft,[13] whereas defendants operate a travel goods retail store.  While these operations are in some competitive proximity with each other in that both target travelers and/or persons interested in travel, I do not find close competitive proximity between them, because of the great differences between the "products" themselves and the commercial channels in which they are marketed, advertised, and sold.  Additionally, the small scale and limited geographic scope of plaintiff's air transport operations further indicate that these operations are not in close proximity with defendants' business operations.

However, to the extent that plaintiff's Pan Am Globe logo and trade tress appears on travel-related consumer goods for retail sale, plaintiff's and defendants' operations are in much closer competitive proximity.  Plaintiff states that it "licenses others to use the Pan Am word mark and Pan Am Globe logo on merchandise," and that "[t]hrough Pan Am's licensee, Pan Am Also uses the PAN AM word mark and Pan Am Globe logo in connection with the operation of a retail store that

---

[13] The record shows that in March of 2005, Pan Am Railways, which is a subsidiary company of Pan Am Systems (also Pan Am's parent company), began to display the Pan Am Globe logo on railroad cars for the carriage of goods.  *See* Culliford Decl. ¶ ¶ 34-35.  This rail freight business has no competitive proximity to defendants' business.

sells travel-related products." Culliford Decl. ¶¶ 32, 33.  These operations are clearly in close competitive proximity with defendants' business of selling travel goods.  Plaintiff does not indicate the scope of these licensing operations, but at least as far as the retail businesses is concerned, plaintiff's statement that its licensee operates "*a* retail store," *see id.* (emphasis added), leads the Court to conclude that it is small in scope.  However, plaintiff has cited plans for expanding its licensing of the Pan Am marks for use on merchandise and its retail services operations.  *See* Culliford Decl. ¶ 36.[14]  In *Nawab*, the Second Circuit noted that the plaintiff had formulated plans to enter the market for telecommunications products and services in the near future, *see Nawab*, 335 F.3d at 150 ("VEL had already begun marketing telephone services in England which would operate in the United States, and, as the district court found, had made plans to sell telephones and wireless telephone service under the VIRGIN name from its retail stores."), and found that these plans "further strengthened" plaintiff's claim of proximity.  *Id.*  Thus even though plaintiff's current presence in this market appears to be small, its plans for expansion form part of the equation and contribute to the weighing of this factor in plaintiff's favor.

Taking into consideration both the varied nature of plaintiff's overall business operations and plaintiff's expansion plans, this factor weighs moderately in favor of plaintiff.

### (4)    Actual Confusion

---

[14] Mr. Culliford stated, "During the past eighteen months or so . . . [t]he Pan Am Companies have initiated a campaign to expand the scope of their past licensing of the Pan Am Marks for use on various sorts of merchandising items, and to aggressively pursue marketing opportunities in that area.  The Pan Am Companies' planned initial focus has been on clothing, model aircraft and trains, and travel-related items such as flight bags.  The Pan Am Companies also have planned to expand their existing operations in the retail services arena, including the operation of Pan Am-branded stores that would sell Pan-Am branded merchandise and other items that relate to travel or otherwise to the legacy of the Pan Am Companies."  *Id.*

27

Plaintiff has not presented any evidence of actual confusion based on defendants' marks or trade dress.  Although evidence of actual confusion is not required to show likelihood of confusion, this factor nonetheless weighs against plaintiff.

### (5)    Bridging the Gap

This factor "refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so."  *Star Industries*, 412 F.3d at 387.  As noted previously, plaintiff's licensee operates a retail store that sells travel-related products.  Furthermore, plaintiff states that it plans to expand retail operations and develop Pan Am-branded stores selling Pan Am-branded merchandise.  Thus, this factor weighs in favor of plaintiff.

### (6)    Bad Faith

 "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Star Industries*, 412 F.3d at 388.  "Prior knowledge of a senior user's mark does not, without more, create an inference of bad faith."  *Playtex Prods., Inc. v. Georgia-Pacific Corp.* 390 F.3d 158, 166 (2d Cir. 2004) (citation omitted).  *See also George Basch Co. v. Blue Coral, Inc.*, 968 F.2d 1532, 1541 (2d Cir. 1992) ("Absent confusion, imitation of certain successful features in another's product is not unlawful and to that extent a free ride is permitted.") (cited in *Playtex Prods.*, 389 F.3d at 166).

Defendants have stated that Flight 001 was generally inspired by the style and history of Pan Am.  *See* Nishi Decl. ¶ 8.  Furthermore, Sencion has stated: "In their heyday, they [Pan Am] were one of the most recognized brands in the world.  Whether it is the colors we use or the interior of our stores, it is the nostalgia of the era."  *Id.*  Thus, it appears that defendants, in promoting their stores,

were attempting to draw upon nostalgia associated with the original Pan Am's style and history. However, it is not at all clear that defendants intended to "sow confusion" as to the source or sponsorship of their store.  Turning to the specific marks at issue on this motion, the Flight 001 Globe logo and blue and white color combination appear to have been intended to be evocative or reminiscent of Pan Am's style.  But the continued use of those marks—particularly in the absence of any Pan Am merchandise or marks—does not seem intended to actually confuse consumers.

### (7)   Quality of Product

The quality of defendant's product can cut either way in the analysis.  On the one hand, "a very marked difference in quality between the two products would militate against finding a likelihood of confusion as consumers will be less likely to assume that the senior user whose product is high-quality will have produced the lesser-quality products of the junior user."  *Star Industries*, 412 F.3d at 389 (internal quotations and citation omitted).  But on the other hand, "if there is no reduction in quality in the [defendant's] product, then [plaintiff] is less likely to have suffered any harm, as the quality factor of *Polaroid* is primarily concerned with whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."  *Id.* (internal quotations and citation omitted).  The parties in this case have not presented any evidence as to how the quality of defendant's goods compares with those of plaintiff.  Thus, this factor does not support either party.

### (8)   Consumer Sophistication

This factor considers whether ordinary purchasers, "buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods," are generally sophisticated enough to understand that the defendant's mark does not

indicate source or sponsorship by the plaintiff.   *Star Industries*, 412 F.3d at 390.  The parties have not presented any evidence relating to consumer sophistication, and this factor does not support either party.

### b.    Overall Assessment of Likelihood of Confusion

The Second Circuit has explained: "[T]he evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Imps. & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir. 1993) (internal quotations and citations omitted).

In this case, the acquired distinctiveness of the Pan Am Globe logo and Pan Am trade dress, the proximity between defendants' travel-related store and plaintiff's air travel services and licensed Pan Am merchandise, and the defendants' intentional use of marks and colors reminiscent of Pan Am weigh, though to varying degrees, in favor of plaintiff.  On the other hand, the lack of inherent distinctiveness of meridian globes and blue and white color combinations, the dissimilarities between the Flight 001 Globe logo and Flight 001 trade dress with plaintiff's marks, and the lack of evidence of actual confusion weigh in favor of defendants.

While the Second Circuit has emphasized that all the *Polaroid* factors are relevant in determining whether a likelihood of confusion exists, the court has also noted that some factors deserve more weight than others, particularly when considered in context. *See Playtex Products,* 390 F.3d 158, 166-67 (2d Cir. 2004) (district court acted properly in finding no likelihood of confusion, even where five of the eight *Polaroid* factors weighed in favor of plaintiff, because the balancing is not a mechanical process and dissimilarity of the marks and, in that case, differences in the products'

presentation to consumers were particularly significant).  The Second Circuit in *Playtex Products* noted the importance of the similarity-of-marks factor and observed that "[i]n an appropriate case, the similarity-of-marks factor may alone be dispositive."  *Id*. at 166-67 (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 48 (2d Cir. 2000)).  *See also Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 966 (2d Cir. 1981) (likelihood of confusion often depends on the similarity of the marks and proximity of the products, even though those two factors alone are not dispositive).  In the case at bar, I place particular emphasis on the dissimilarity of the two marks and the lack of evidence of actual confusion in concluding that consumers are not likely to be confused as to source or sponsorship by defendants' current use of the Flight 001 Globe logo or a blue and white color combination.  I note that this analysis only considers such use *without* any accompanying use of Pan Am marks or sale of Pan Am merchandise.

Although plaintiff has not demonstrated that it is likely to succeed on its trademark infringement claim (for defendants' current practices), I do conclude that plaintiff has demonstrated serious questions going to the merits.

**D.     Unfair Competition**

The Second Circuit has recognized a claim for unfair competition, or false designation of origin, under Section 43(a)(1)(A) of the Lanham Act when an unregistered mark "is so associated with its goods that use of the same or similar term by another company constitutes a representation that its goods come from the same source."  *Genesee Brewing Co. v. Stroh Brewing Co.,* 124 F.3d 137, 149-50 (2d Cir. 1997).  This claim can apply even when a mark is unregistrable because it is or has become generic.  *Id.*

Plaintiff argues that it has a viable claim for unfair competition relating to the FLIGHT 001

31

mark under Section 43(a)(1)(A) because that section does not explicitly require a party to have used or continue to use a mark.  But courts in the Second Circuit have rejected this interpretation. "Although the language of Section 43(a) imposes a requirement of 'use [ ] in commerce' only on the infringing mark, courts impose the requirement that an unregistered trademark in which a plaintiff claims a protectable interest must likewise be used in commerce." *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 2005 WL 1164073, at *7 (S.D.N.Y. May 18, 2005).  *See also Punchgini,* 482 F.3d at 153-54 (rejecting unfair competition claim under Section 43(a)(1)(A) where plaintiff had abandoned use of the mark in the United States).  *Genesee Brewing* does not hold otherwise.  That case explained that an unfair competition claim under Section 43(a)(1)(A) could apply to generic marks, but by no means eliminated the general requirement of prior and continuing usage to establish priority of right.[15]

In this case, the original Pan Am operated a Flight 1 from 1942 to 1981.  But, as noted above, the original Pan Am never used the term "Flight 1" to distinguish its services from those offered by other airlines or companies; and in any event, it permanently discontinued the flight in 1981 and sold the line to United Airlines in 1985.[16]  Nor has plaintiff demonstrated that the term Flight 001 is so associated with Pan Am that use of the FLIGHT 001 mark—without any accompanying references to Pan Am—constitutes a representation that the source of the goods or services is Pan Am.

For these reasons, plaintiff has not demonstrated that it is likely to succeed on its Section

---

[15] The plaintiff in *Genesee Brewing* marketed, labeled, and advertised its beer with the words, "Honey Brown," the mark at issue in the case.  *Genesee Brewing,* 124 F.3d at 141.

[16] Thus, the original Pan Am did not appear to hold any "unfair competition" rights in the FLIGHT 001 mark in 1993, and plaintiff could not have acquired such rights in the1993 bankruptcy proceeding.

43(a)(1)(A) unfair competition claim based on defendants' current use of the FLIGHT 001 mark.

**E.   Trademark Dilution**

Plaintiff asserts a claim under the Federal Trademark Dilution Act, codified as section 43(c) of the amended Lanham Act, 15 U.S.C. § 1125(c).  Section 43(c) provides:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

15 U.S.C. §1125(c)(1).[17]  To prevail on a claim of trademark dilution, plaintiff must show that its mark is "famous" and that defendants' subsequent use of the mark (or similar marks) in commerce is likely to cause dilution by blurring or dilution by tarnishment.  Here, plaintiff alleges dilution by blurring, which is defined in the statute as an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark."  15 U.S.C. § 1125(c)(2)(B).  Dilution by blurring has also been defined as "diminishing the capacity of the mark to identify and distinguish goods and services."  *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004).

As explained above, this preliminary injunction opinion focuses on the defendants' current—rather than past—practices.  Therefore, the only trademark dilution presently at issue for the Court is whether defendants' Flight 001 Globe logo is likely to dilute the Pan Am Globe logo in violation of Section 43(c).

---

[17] The quoted language is from a 2006 amendment to the statute.  The amendment did away with the Supreme Court's holding in *Moseley v. Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003), that "actual dilution must be established" in order to entitle a plaintiff to an injunction.

Plaintiff has sufficiently established that the Pan Am Globe logo is famous.  The issue is whether the Flight 001 Globe logo is likely to impair the distinctiveness of the Pan Am Globe logo. The statute specifies a number of non-exclusive factors for determining "whether a mark or trade name is likely to cause dilution by blurring": (i) the degree of similarity between the mark or trade name and the famous mark; (ii) the degree of inherent or acquired distinctiveness of the famous mark; (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) the degree of recognition of the famous mark; (v) whether the user of the mark or trade name intended to create an association with the famous mark; and (vi) any actual association between the mark or trade name and the famous mark.  15 U.S.C. § 1125(c)(2)(B).

The Flight 001 Globe logo is somewhat reminiscent of the famous Pan Am Globe logo.  But the various dissimilarities between the globe logos, the context in which the logo is used by defendants (as an element in the "f1" store display and the FLIGHT 001 design mark, rather than as a stand-alone image), and the fact that numerous other travel-related companies use meridian globe logos suggest that the defendants' globe logo is not likely to diminish the capacity of the Pan Am Globe logo to identify and distinguish goods and services; these factors weigh strongly against a likely finding of trademark dilution.  On balance, I conclude that plaintiff has not shown that it is likely to succeed on its trademark dilution claim based on defendants' use of the Flight 001 Globe logo.

**F.      Irreparable Harm and Balance of Hardships**

I conclude that plaintiff has not demonstrated a likelihood of success on the merits for its trademark infringement, unfair competition, and trademark dilution claims based on defendants' current practices.  But plaintiff may nonetheless be entitled to a preliminary injunction if it

demonstrates "probability of irreparable harm in the absence of injunctive relief" and "a serious question going to the merits and a balance of hardships tipping decidedly in its favor." *Nawab*, 335 F.3d at 145.  Because plaintiff has raised sufficiently serious questions going to the merits on a number of its claims, I consider whether it has established probability of irreparable harm and a balance of hardships tipping decidedly in its favor.

In trademark infringement actions, "proof of a likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm." *Brennan's*, 360 F.3d at129.  In this case, plaintiff's attempted showing of irreparable harm was premised entirely on likelihood of success on the merits of its claims.  Because I conclude that plaintiff has not demonstrated a likelihood of success on the merits of its claims relating to defendants' current practices, plaintiff has not established irreparable harm.

In addition, the balance of hardships weighs heavily in favor of the collective FLIGHT 001 defendant.  If a preliminary injunction against defendant's trade dress and use of the FLIGHT 001 mark were granted, defendant would have to change its store signage, bags, product hand tags, gift wrap, gift cards, and website; and the company would lose the goodwill it has developed in the FLIGHT 001 mark over the past seven years.  Flight 001 estimates that such that such changes would cost the company $1.8 million in lost revenue and out of pocket costs, and could well put the company out of business.  *See* Defs.' Opp'n Br. at 16-17.  In contrast, plaintiff has not alleged any hardship from the denial of a preliminary injunction (besides the presumption of irreparable harm associated with a trademark infringement claim that is likely to be successful, which does not apply here because I have found that plaintiff is not likely to succeed on those claims).

Thus, plaintiff has not demonstrated the likelihood of irreparable injury or the balance of

hardships needed to justify a preliminary injunction.[18]

## III. CONCLUSION

For the reasons above, plaintiff's motion for a preliminary injunction is denied.

Counsel are directed to send letters to the Court not later than August 8, 2007, stating their

views with respect to the present status of the case and the next steps to be taken.

It is SO ORDERED.

Dated: New York, New York
July 13, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE

---

[18] Defendant argued in its briefs and at oral argument that plaintiff's delay in seeking a preliminary injunction militated against a finding of irreparable harm. A plaintiff's laches can have that effect, *see Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 n.9 (2d Cir. 1999), but the delay in this case does not strike me as so extreme, and in any event plaintiff's motion for a preliminary injunction fails for the unrelated reasons stated in text.

36